**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**LEXINGTON DIVISION**

**CRIMINAL ACTION NO. 05-53-JBC**

**UNITED STATES OF AMERICA,**                                                    **PLAINTIFF,**

**V.**                                   **MEMORANDUM OPINION AND ORDER**

**CARL DANNY SWANGER and**
**CARRIE ANN SIMPSON**

                                                                                **DEFENDANTS.**

**\* \* \* \* \* \* \* \* \* \* \***

This matter is before the court on the motions of the defendants, Carl Danny Swanger and Carrie Ann Simpson, to suppress evidence obtained during a search of a hotel room. Ms. Simpson also requests that her statements while in custody be suppressed. The court held an evidentiary hearing on May 23, 2005 regarding these motions, after which the parties filed supplemental briefs. Mr. Swanger filed a motion to join in Ms. Simpson's supplemental brief. The United States filed a motion for oral argument. The court, having reviewed the record and being otherwise sufficiently advised, will grant Mr. Swanger's motion to join Ms. Simpson's arguments, will deny both of the motions to suppress, and will deny as moot the government's motion for oral argument as moot.

**I.    FINDINGS OF FACT**

On December 19, 2004, DEA Task Force Officer Rick Johnson was working off-duty as a security guard at Wal-Mart in Richmond, Kentucky. Officer Johnson saw two women, one with blond hair and one with red hair, purchase four cans of Coleman

camping fuel and four cans of Prestone starter fluid.  (TR 14-15)  Because both of these items are precursors for methamphetamine manufacture, he became suspicious.

Officer Johnson observed the two women get into a red Ford vehicle and leave the Wal-Mart parking lot.  (TR 15)  He contacted the Richmond Police Department to determine to whom the vehicle was registered.  (TR 15)  After learning that it was registered to Carl D. Swanger of Berea, Kentucky, Officer Johnson contacted Sergeant Brewer, a Berea police officer, and gave him the general description of the women and the vehicle.  Sergeant Brewer told Officer Johnson that Mr. Swanger associated with a female named Carrie Simpson, who matched the description of one of the women at Wal-Mart.  (TR 16)  Ms. Simpson had an address at Hampton Way in Richmond.

Officer Johnson contacted his brother, Patrolman Joe Johnson, and communicated the information that he had gathered about the vehicle, including the license plate number, the items purchased, a general description of the women, and that one of the women might be Carrie Simpson.  (TR 17)  At Officer Johnson's request, Patrolman Johnson went to Ms. Simpson's residence and found that the red vehicle was not present.  (TR 45)  Then he returned to his normal patrol duties, which included patrolling several hotel parking lots, one of which was the Quality Quarters Inn.  (TR 46)

When Patrolman Johnson arrived at the Quality Quarters Inn, he observed a red vehicle occupied by four people backed into a parking spot.  (TR 47)  He continued driving around the hotel and when he drove past the vehicle again, he noticed that the

2

driver's door was open and only three individuals were in the vehicle.  (TR 48)  He parked his police cruiser and got out to talk with the individuals. (TR 47)  When he approached the car he asked for identification, and after seeing her identification discovered that Ms. Simpson was in the front, passenger seat. (TR 49)  One of the other two passengers in the back seat, Christina Rodgers, provided identification, but the other passenger, Dameon Forester, did not have any.  Patrolman Johnson testified that there was "something strange" about a vehicle in the parking lot of a hotel at 2:00 a.m., that Quality Quarters Inn was well-known for drug activity, and that numerous vehicle break-ins and robberies had occurred at motels in the area.  (TR 80-81) Patrolman Johnson testified that the passengers appeared nervous and that they "kept looking around at each other."  Patrolman Johnson asked Ms. Simpson about the Wal-Mart purchases and she explained that she and her boyfriend had rented a cabin so they needed the Coleman fuel to heat it and that her boyfriend was a truck driver so he needed the Prestone starter fluid for his truck.  Patrolman Johnson asked Ms. Simpson if he could search the car but she refused to consent.

At some point Mr. Swanger came out of the hotel, and Patrolman Johnson went toward the back of the vehicle to talk with him.  (TR 49)   Patrolman Johnson requested identification, which Mr. Swanger provided to him.  Patrolman Johnson asked Mr. Swanger whether the car contained anything that "he needed to know about" and Mr. Swanger told him that he was not going to search the vehicle.  (TR 50)  While talking with Mr. Swanger, Patrolman Johnson verified that this vehicle was the

3

one driven by the two women at Wal-Mart by checking the license plate numbers.  (TR 51)  After consent to search was denied, Patrolman Johnson detained the defendants until a narcotics canine could be located and arrive to sweep the vehicle.  (TR 50-51) Approximately six minutes passed before the canine unit arrived at the Quality Quarters Inn.

Corporal Bowles, the canine officer, and the narcotics canine swept the car while the passengers were inside it.  (TR 55)  The canine alerted on the vehicle by sitting down.  (TR 55)  At the evidentiary hearing, Patrolman Johnson was unable to answer questions about canine search procedures.  (TR 72)  After the canine alerted, the occupants were removed from the vehicle and patted down by Corporal Craft and Corporal Bowles.  (TR 55)  Corporal Bowles and Patrolman Johnson then performed a search of the vehicle.  Two cellophane wrappers with methamphetamine residue and a list of items that are used to produce methamphetamine were found in Ms. Rodgers's purse in the backseat of the car.  (TR 56)  A roll of Reynolds Wrap and a bottle of Heet were found in the trunk of the car, both of which can be used in the manufacture of methamphetamine.  (TR 57)

Corporal Bowles found out from the Quality Quarters Inn desk clerk that Ms. Simpson had registered for Room 147 at the hotel.  Ms. Simpson declined to consent to a search of the room.  Patrolman Johnson obtained a search warrant for the hotel room based on his affidavit and the police recovered, among other items, approximately 3,711 pseudoephedrine tablets, a few Allegra tablets, three cans of

Prestone starter fluid, approximately 32 lithium batteries, two boxes of plastic sandwich bags, an Ortho garden sprayer, a bottle of drain opener, plastic tubing, several rolls of black electrical tape, three boxes of rock salt, metal fittings with blue residue, and a .45 caliber Glock model pistol. (Search Warrant Return for Room 147 Quality Quarters  12/19/04)

The affidavit contained a few inaccurate statements, including that Officer Johnson saw Carrie Simpson[1] and Christina Rodgers purchase four gallons of Coleman fuel, four cans of Prestone starting fluid, two eight-packs of Lithium batteries, and one bottle of Liquid Lightening at Wal-Mart and that he learned Ms. Simpson's room number from the desk clerk.[2]  (TR 58-59)  Officer Johnson saw the women purchase only two of the four items listed in the affidavit,[3] and Corporal Bowles, not Patrolman Johnson, learned the room number from the desk clerk.  (TR 72)

---

[1] The name of the defendant, Carrie Simpson, is misspelled in the affidavit. There, it is spelled "Carry".  To avoid confusion, the court will spell it "Carrie" even when referring to the affidavit's content.

[2] Ms. Simpson also argues that the sentence "I observed the vehicle being driven by the people who made the aforementioned purchases . . ." is inaccurate because Patrolman Johnson did not actually see the vehicle being driven.  The court finds that the sentence is accurate if read to mean that it was the car that was driven by the women who made the purchases at Wal-Mart.

[3] Officer Johnson did not know the names of the women who purchased the items at Wal-Mart; instead, based on his discussion with the Berea police officer, he knew that one of them might be Carrie Simpson.  The affidavit does not necessarily represent that Officer Johnson knew the names of the women at the time that they made their purchases.  While it would have been more specific for the affidavit to read that Officer Johnson saw two women, one blond and one with red hair, purchase the items, the way it is phrased is not inaccurate.

## II.   ANALYSIS

## A.   Search of the Hotel Room

The defendants argue that the evidence obtained during a search of their hotel room must be suppressed.  The search warrant which provided the government access to the hotel room was in part supported by evidence obtained during a warrantless search of Mr. Swanger's vehicle which occurred after the defendants were detained until a narcotics dog performed a sweep of the vehicle.  The defendants argue that the information included in the search warrant resulted from illegal conduct.  To determine whether the search warrant was based on such illegal information, the court must evaluate the defendants' initial encounter with the police, the validity of the detention until the narcotics dog arrived and performed a sweep of the car, and the warrantless search of the car.  Additionally, the defendants argue that the search warrant was invalid because it contained false and misleading information and did not list a time or date for Officer Johnson's observations of the purchases at Wal-Mart.

## 1.   Initial Encounter

The defendants argue that their initial encounter with Patrolman Joe Johnson with his questions and request for identification constituted an illegal stop in violation of the Fourth Amendment.  "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him to answer some questions . . . if the person is willing to listen." *Florida v. Royer*, 460 U.S. 491, 497 (1983) (plurality opinion).  Additionally, asking

for and examining an individual's identification is permissible and without more does not constitute an illegal stop.  *Id.* at 501.

It was permissible for Patrolman Johnson to ask the defendants for identification and permission to search the car.  Both Mr. Swanger and Ms. Simpson had the right to refuse to answer his questions or provide identification, and if they had done so, the officer would not have been able to pursue the matter further.  When talking with the defendants, Patrolman Johnson did not restrain them, block their path, or otherwise control their movement by retaining their identification.  Rather, Patrolman Johnson simply asked Ms. Simpson about the Coleman fuel and starter fluid that she purchased at Wal-Mart and asked the defendants for identification and for permission to search the car, all of which are permissible questions and do not constitute an investigative detention or a custodial arrest.[4]  *See United States v. Thame*, 846 F.2d 200, 203 (3d Cir. 1988) (holding that it was permissible to ask the defendant for his airline ticket and identification and that doing so did not constitute a stop or an arrest).

## 2.  Detention of the Defendants Until Narcotics Canine Arrived

After the defendants refused to permit Patrolman Johnson to search the car, he detained them until a narcotics canine arrived and performed a sweep of the vehicle. Like a traffic stop, this detention is more akin to an "investigative detention rather than

---

[4] At the hearing, Mr. Swanger's attorney questioned Patrolman Johnson about whether the defendants could have left during this initial encounter due to the location of the police cruiser.  When Patrolman Johnson stopped to question the defendants, he pulled in front of Mr. Swanger's car; he noted that despite the police cruiser's location, the defendants could have departed from the scene because the spaces to the left of the car were vacant.  (TR 63)

7

a custodial arrest, and the principles announced in *Terry v. Ohio*, 392 U.S. 1 (1968), apply to define the scope of reasonable police conduct." *United States v. Bailey*, 302 F.3d 652, 657 (6th Cir. 2002). Under *Terry*, a law enforcement officer "may briefly stop and detain an individual for investigative purposes if he has a reasonable suspicion supported by articulable facts that 'criminal activity may be afoot,' even if he lacks probable cause." *Bailey*, 302 F.3d at 658.

The legitimacy of a *Terry* stop is evaluated in a two-part analysis. First, the court determines "whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which give rise to reasonable suspicion." *United States v. Garza*, 10 F.3d 1241, 1245 (6th Cir. 1993). The court must consider the "totality of the circumstances" when making reasonable-suspicion determinations. *United States v. Arvizu*, 534 U.S. 266 (2002). While reliance on a mere "hunch" is insufficient to justify a stop, reasonable suspicion can be established by a police officer's knowledge about recent criminal conduct in the area. *United States v. Anderson*, 923 F.2d 450, 456 (6th Cir. 1999). Even a string of innocent behavior added together may amount to reasonable suspicion of criminal activity. *United States v. Richardson*, 385 F.3d 625, 631 (6th Cir. 2004). The court must accord deference to a law enforcement officer's ability to distinguish between innocent and suspicious actions. *United States v. Lopez-Martinez*, 25 F.3d 1481, 1484 (10th Cir. 1994).

Patrolman Johnson had reasonable, articulable suspicion to detain the

8

defendants until a narcotics canine arrived and performed a sweep of the vehicle.  At the time that he detained the defendants, he knew that the vehicle had been involved with the purchase of the Coleman fuel and starter fluid at Wal-Mart,  that two of the occupants matched the description of the females who purchased those items, and the vehicle's tag number.  He also knew that Quality Quarters Inn was well-known for drug activity and that numerous vehicle break-ins and robberies had occurred at area motels.  (TR 80-81)  Further, the defendants' being outside the hotel, backed into a parking spot, at 2:00 a.m. was suspicious to Patrolman Johnson.  (TR 64)  All of these factors together under the "totality of the circumstances" constitute reasonable suspicion that criminal activity was afoot.[5]   Even though these facts might be innocuous individually, to a trained law enforcement officer the totality of the circumstances created reasonable suspicion.

Second, after ensuring that the basis for the *Terry* stop was proper, the court must determine "whether the degree of intrusion into the suspect's personal security was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the official's conduct given his suspicions and the surrounding circumstances."  *Garza*, 10 F.3d at 1245.  Here, detention of the defendants while a drug-sniffing dog arrived and swept the car was reasonable given Patrolman Johnson's

---

[5] Patrolman Johnson also stated that the passengers' nervousness played a part in his suspicion.  While it can be considered in finding reasonable suspicion, there is nothing inherently suspicious about nervousness.  Typically, it is an unreliable factor because many citizens become nervous during a police stop even when they have nothing to fear.  *United States v. Richardson*, 385 F.3d 625, 630-31 (6th Cir. 2004).

suspicions and the surrounding circumstances.  A few hours before the stop occurred, Ms. Simpson was seen purchasing precursors to methamphetamine with another female and they were seen driving away in the same vehicle that was swept.  The defendants were in a hotel parking lot at a late hour in a high-crime area.

Further, the intrusion into the defendants' personal security was reasonably related in scope to the situation at hand.  The defendants were detained for a period of approximately six minutes until the dog arrived and for a few minutes while the sweep was performed.  Even if a drug-sniffing dog arrives within a few minutes of the completion of the stop, detention until the dog arrives may constitute a violation of the Fourth Amendment if the law enforcement officer does not have reasonable suspicion of criminal activity.  *Hill v. Beyer*, 62 F.3d 474, 482 (3d Cir. 1995) *cited by United States v. Bailey*, 302 F.3d 652, 658  n. 6 (6th Cir. 2002).  Given the government's interest in halting illegal drug use and manufacturing and because Patrolman Johnson had reasonable suspicion of criminal activity during this period, the short detention is permissible.

Patrolman Johnson's statement at the evidentiary hearing that the "trigger" for detaining the defendants and obtaining a narcotics dog was their refusal to consent to search does not automatically result in the detention being unconstitutional.  Until Mr. Swanger's refusal to consent to the search of the vehicle, the encounter was consensual and the defendants were free to leave.  Only after the defendants exercised their constitutional right to refuse the search did the encounter become a

10

stop.   "Refusal to consent to a search *alone* cannot be the basis of reasonable suspicion."   *United States v. Manuel*, 106 F.2d 272, 274 (10th 1993) (emphasis added).  The court must determine whether prior to the defendants' refusal to consent to the search Patrolman Johnson had reasonable suspicion to detain the defendants. *United States v.Boyce*, 351 F.3d 1102, 1110 (11th Cir. 2003) ("The police cannot base their decision to prolong a traffic stop on the defendant's refusal to consent to a search.   Such a refusal may only be considered when the police have already observed, before asking for permission to search, facts sufficient to raise a reasonable suspicion.")  Since Patrolman Johnson had reasonable suspicion that criminal activity was afoot before he asked for permission to search the vehicle, the detention until the narcotics canine arrived was permissible.

**3.     Search of the Vehicle**

After the dog alerted on Mr. Swanger's vehicle, the officers conducted a warrantless search of it.  To justify this search, the United States must show that the officers had probable cause to believe that the vehicle would contain evidence of criminal activity.   Probable cause is defined as "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion."  There must have been a "fair probability that contraband or evidence of a crime" would be found in the car.  *United States v. Padro*, 52 F.3d 120, 122-23 (6th Cir. 1995).  A positive alert by a qualified narcotics dog establishes probable cause to search the vehicle. *United States v. Navarro-Camacho*, 186 F.3d 701 (6th Cir. 1999).  The government

11

bears the burden of establishing the training and reliability for the dog's positive reaction. *Illinois v. Caballes*, 125 S.Ct. 834 (2005).

The United States has failed to establish the qualifications of the drug dog.[6] Consequently, the dog's alert on the car cannot be the basis of probable cause to search the car. The United States argues that the defendants waived this argument because neither defendant questioned the canine's reliability in their motion to suppress.[7] The United States' contention fails because it bears the burden of proof on this issue. It is not the duty of the defendants to challenge the canine's reliability; rather, it is the duty of the United States to prove the canine's qualifications, reliability, and certification. *See United States v. Diaz*, 25 F.3d 392, 394 (6th Cir. 1994) ("[F]or a positive dog reaction to support a determination of probable cause, the training and reliability of the dog must be established.") Without the canine's alert to the vehicle, the police officers did not have probable cause that it contained evidence of criminal activity and the search of the vehicle was thus impermissible.

The United States also argues that Ms. Simpson does not have standing to

---

[6] At the hearing, Mr. Swanger challenged the validity of the canine's sweep of the vehicle while the occupants remained inside it. There is nothing to support a claim that such a practice is improper. *See United States v. Richardson*, 385 F.3d 625 (6th Cir. 2004) (court did not note an error when narcotics canine was used to sweep the car while the occupants remained inside it).

[7] While the United States is correct that Mr. Swanger did not challenge the canine's qualifications in his motion to suppress, Ms. Simpson did raise the issue in her motion. Whether the issue was raised is irrelevant, however, because it is the government's burden to prove that the warrantless search was justified. Proving the qualifications of the canine is part of meeting that burden.

challenge the search of Mr. Swanger's vehicle.   Ms. Simpson had a subjective
expectation of privacy in the vehicle, which was objectively reasonable. *Guest v. Leis*,
255 F.3d 325 (6th Cir. 2001).  Although the vehicle was registered to Mr. Swanger,
Ms. Simpson exercised control over it when she drove it earlier that night.   This
demonstrates a subjective expectation of privacy.   Because Mr. Swanger and Ms.
Simpson lived together and shared use of the vehicle, this expectation is objectively
reasonable.   Consequently, she has standing to challenge the search.

**4.   Search Warrant**

The defendants challenge the validity of the search warrant[8] because the
affidavit contained false information and because the affidavit was missing the date
and time of Officer Johnson's observations.[9]

At the evidentiary hearing, the defendants established that the affidavit
contained information that was knowingly false or made with reckless disregard for the
truth.   Patrolman Johnson testified that his brother told him that the two women

---

[8] As discussed above, the government failed to establish that the search of
the vehicle was supported by probable cause.  If the affidavit contained any
information resulting from the illegal search, the court would have to redact the
affidavit to eliminate that information.  The affidavit does not mention the fruits of
the car search (the cellophane wrappers, the shopping list, the HEET, or the rolls of
Reynolds Wrap) so there is no need to redact the affidavit because of the vehicle
search before deciding whether it contained sufficient evidence to establish
probable cause.

[9] "As a preliminary matter, [the court notes] that a 'state search warrant
being challenged in a federal court must be judged by federal constitutional
standards.' [The court's] review is limited to the four corners of the application and
affidavit." *United States v. Elliott*, 576 F. Supp. 1579, 1580 (S.D. Ohio 1984).

purchased Coleman fuel and Prestone starter fluid, but not that they purchased Liquid Lightening or lithium batteries.  At a minimum, including in the affidavit a statement that Officer Johnson told him that they purchased all four of those items was reckless disregard for the truth.[10]  Consequently, the court must extract that false information from the affidavit and determine whether, under the totality of the circumstances, the affidavit still supports a finding of probable cause.  *Franks v. Delaware*, 438 U.S. 154 (1978).[11]  Even after striking the false statement, the court finds that the affidavit's contents are sufficient to establish probable cause.  Determination of probable cause is "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  Given all of the circumstances described in the affidavit – that the women purchased two precursors to manufacturing methamphetamine at Wal-Mart, that a narcotics canine alerted on the vehicle driven by the women when making those purchases,[12] and that

_____

[10] The defendants have not shown that the other alleged "false statements" were false or that they were made knowingly or intentionally or with reckless disregard for the truth.

[11] The United States argues that the defendants did not meet the requirements to show that they were entitled to a *Franks* hearing.  In their supplemental brief, the defendants argue that the court already held a *Franks* hearing.  The court agrees with the defendants that it dealt with the issues involved in such a hearing during the evidentiary hearing and that to hold an additional hearing is unnecessary.

[12] The sweep by the narcotics canine was legal because detaining the defendants while it was performed was supported by reasonable suspicion.  Even though the United States did not put on proof that the narcotics canine was

14

the women were in the vehicle outside the Quality Quarters Inn where drug activity was known to occur – there was a fair probability that property or items commonly used in the manufacturing of methamphetamine would be found in the hotel room registered to Ms. Simpson at that hotel.  Since the search of the hotel room was performed pursuant to a valid search warrant, the evidence obtained should not be suppressed.

Citing *Rosencranz v. United States*, 356 F.2d 310 (1st Cir. 1966), the defendants argue that the failure of the affiant to include information about when the observations of the purchases were made is fatal to the search warrant.  *See also United States v. Boyd*, 422 F.2d 791 (6th Cir. 1970) (approving the reasoning in *Rosencranz*).  This situation in this case differs from that in *Rosencranz*.  There, the court concluded "that a combination of undated conclusory information from an anonymous source and an undated general allegation of personal observation by the affiant, with no other reasonably specific clues to the time of their happening, is inadequate." *Rosencranz*, 356 F.2d at 318.  Here, the affidavit contained the date and time the affiant received the information.   This provides the issuing judge a "reasonably specific clue" as to the time of their happening, which is more of an indication of time than in *Rosencranz*.  Finding that this warrant is valid despite the lack of the specific date or time of the observations does not "open the door to

---

qualified, reliable, and certified, the defendants did not show that the statement that the "drug detecting dog, who is trained in detecting illegal drugs, alerted on the vehicle" was false when it was made or was made with reckless disregard for the truth, so the court need not exclude it from the affidavit.

15

unsupervised issuance of search warrants on the basis of aging information."
*Rosencranz*, 356 F.2d at 316-17.

**B.      Carrie Simpson's Statements While in Custody**

Ms. Simpson also argues that her statements while in custody must be suppressed because they were the "fruits" of an illegal arrest. Ms. Simpson was in custody for nine hours before she was formally arrested. During this time, she was questioned twice – once at the hotel and once at the police station. As discussed in this order, the detention of the defendants was valid from its inception and no illegal arrest occurred. Consequently, Ms. Simpson's custodial statements should not be suppressed. Accordingly,

**IT IS ORDERED** that the motion of the defendant, Carl Danny Swanger, to join the supplemental brief of his co-defendant, Carrie Simpson, is **GRANTED**.

**IT IS FURTHER ORDERED** that the motion of the defendants to suppress evidence obtained during a search of their hotel room is **DENIED**.

**IT IS FURTHER ORDERED** that the motion of the United States for oral argument is **DENIED AS MOOT**.

Signed on August 18, 2005

*Jennifer B. Coffman*
JENNIFER B. COFFMAN, JUDGE
U.S. DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY